**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 14 East 52nd Street Devco LLC, | ) | Case No. 1-23-41364 (ESS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**DECLARATION IN SUPPORT OF THE MOTION FOR ENTRY OF ORDER**
**PERMITTING INMOPRISA TO MARKET THE PROPERTY AND GRANTING**
**RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Gloria Cedeño de Hoces, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1.      I am the Vice President of Inmoprisa USA, Inc. ("Inmoprisa").  I submit this declaration in support of the *Motion for Entry of an Order Permitting Inmoprisa to Market the Property and Granting Related Relief*, (the "Motion"), filed by Inmoprisa.

2.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with Inmoprisa's executive directors, my review of relevant documents and information, or my opinion based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of Inmoprisa.

3.      On May 8, 2018, Inmoprisa and 14 East 52 Owner LLC ("Owner LLC"), an affiliate of Macklowe Properties, the prominent real estate development firm, entered into a contract for the sale of a property located at 14 East 52nd Street, New York, New York (the "Property") for a $45,000,000 purchase price with a $4,500,000 deposit ("2018 Contract").

4.      Upon information and belief, Macklowe Properties owns the buildings adjacent to the Property and intends to use that real estate and the Property to construct a 100,000 square foot luxury mixed-used building called TowerFifth as shown on its website: www. Mackloweproperties.com/current-projects.html.

5.      The closing of the sale under the 2018 Contract had been scheduled for May 31, 2019, but was extended at the request of Owner LLC, to June 25, 2019.  In preparation for closing, Inmoprisa terminated the lease with the lessee who had been occupying the Property. *See* Cedeño de Hoces Declaration at ¶ 5.  After Owner LLC again failed to close the transaction, Inmoprisa sent a notice of default to Owner LLC on June 26, 2019.

6.      On June 26, 2019, Inmoprisa agreed to further extend the closing of the 2018 Contract to July 24, 2019, in exchange for Owner LLC reimbursing Inmoprisa for certain costs and expenses related to the Property from and after the date thereof until closing.  Owner LLC delayed the closing again to July 25, 2019, and then to August 2, 2019.

7.      Again, Owner LLC failed to close the transaction, and on August 2, 2019, Inmoprisa agreed to further extend the closing deadline to January 24, 2020, in exchange for Owner LLC's increase the deposit to $6,750,000 and reimburse Inmoprisa for the related costs and expenses of upkeeping the Property.  Upon Owner LLC's failure to close on January of 2020, Inmoprisa granted a further extension to July 31, 2020, in exchange for a further increase of the deposit to $9,000,000 and additional cost reimbursements.

8.      On June 11, 2020, Inmoprisa sent Owner LLC a final notice terminating the 2018 Contract based upon Owner LLC's failure to close the transaction over the prior two years. Inmoprisa retained the deposit as liquidated damages.

9.      In early 2023, Macklowe Properties, this time through its affiliate Raciv Corp., agreed again to purchase the Property.

10.      Pursuant to the Contract executed on February 23, 2023 (the "Contract"), Inmoprisa agreed to sell, and Raciv Corp. agreed to buy, the Property at a purchase price of $22,500,000.[1] Raciv Corp. paid a deposit in the amount of $3,000,000 (the "Deposit") to be held by John A. Goodman as escrowee (the "Escrow Agent") and applied in accordance with the Contract.

11.      On April 8, 2023, Raciv Corp. assigned and transferred to 14 East 52nd Street Devco LLC, the Debtor (which, upon information and belief has a business relationship with Macklowe Properties) all of Raciv Corp.'s right, title and interest in and to the Contract (including but not limited to any contract deposit delivered in accordance with the Contract), and the Debtor agreed to perform any and all obligations of Raciv Corp. pursuant to the Contract.[2]  While the Debtor's petition was executed by Tim Ziss, the owner of Allied Properties LLC, upon information and belief, the Debtor is also affiliated with Macklowe Properties or at least there is a business relationship or understanding between the Debtor and Macklowe Properties.

12.      Closing under the Contract was required to occur on or about April 10, 2023. Specifically, the Contract contained a provision that noted "[t]ime shall be of the essence with respect to the obligation of Buyer to purchase the [Property] on the Closing Date." *See* Annex 1, Contract.

13.      In order to utilize the tax loss that will result from the sale and obtain tax refunds, Inmoprisa must complete the sale of the Property before October 31, 2023.  Inmoprisa's fiscal year for tax purposes ends on October 31.  As a result of the deposit and other damages collected by

---

[1] A true and correct copy of the Contract is attached hereto as Annex 1.
[2] After the Contract was assigned from Raciv Corp. to the Debtor, I understand that Harry Macklowe of Macklowe Properties continued to negotiate on behalf of the Debtor in discussions with Alberto Palatchi, the Sole Director and President of Inmoprisa, and representatives from Avison Young New York LLC, the broker for the Property.

Inmoprisa from Owner LLC under the 2018 Contract, Inmoprisa reported a capital gain of approximately $10,308,725 for the tax year ending October 31, 2020, and paid U.S. federal, New York State and New York City corporate income taxes on such gain for a total amount of approximately $2,779,707. Based on the purchase price under the Contract, Inmoprisa would recognize a capital loss of approximately $ 12,227,212 on the sale of the Property. Given market conditions, Inmoprisa would likely recognize a loss of similar quantum if it were to sell the Property to a third party. Under U.S. federal income tax law, New York State income tax law, and New York City income tax law, C-corporations such as Inmoprisa may carry back a capital loss up to a maximum of three tax years. As such, if Inmoprisa closes the sale of the Property *before* October 31, 2023, Inmoprisa would be able to carry back the capital loss that results from such sale to offset the capital gain recognized in the tax year ended October 31, 2020, thus obtaining refunds of the approximately $2,779,707 of taxes paid that year. If, however, Inmoprisa closed a sale of the Property *after* October 31, 2023, even at a loss, Inmoprisa will not be able to carry back the loss to obtain a refund of the taxes paid with respect to the tax year ending on October 31, 2020, because the loss would be recognized, at the earliest, in the tax year ending October 31, 2024 and thus beyond the maximum 3-year period allowed for the carryback of a capital loss by a C-corporation under applicable tax law. Because Inmoprisa is a holding company for the Property (it does not have any other activity or assets) and will be dissolved after the sale of the Property, Inmoprisa will have no income or gain in later tax years against which it could utilize a loss from the sale of the Property. In short, if Inmoprisa closes a sale of the Property *after* October 31, 2023, Inmoprisa will recognize a very sizable economic loss on its investment in the Property but will not be able to realize any tax relief from such loss, adding insult to injury.

14.     On April 9, 2023, (at approximately 6:15 PM Eastern Time) the Debtor notified Inmoprisa that closing would not occur on April 10, 2023, despite being reminded again that time was of the essence.[3]

15.     Inmoprisa issued a notice of default to the Debtor on April 13, 2023, which triggered a five (5) business day cure period under the Contract.[4]

16.     Only minutes before the expiration of the cure period, on April 20, 2023, the Debtor filed a petition for relief under chapter 11 of title 11 of the Bankruptcy Code.  Specifically, Debtor's counsel stated that "Seller is stayed from entering into any other contract relating to the subject property or otherwise impeding the Debtor's [sic] purchase the property or releasing the deposit absent an Order of the Bankruptcy Court.[5] "

17.     Nonetheless, as a result of the Debtor's failure to close by April 10, 2023, Inmoprisa has incurred additional costs, which are expected to include $83,000 in real estate property taxes, $30,000 in building maintenance costs and $18,500 in insurance fees through June 20, 2023.

18.     On April 21, 2023, Inmoprisa sent a letter to the Escrow Agent directing the release of the Deposit, but, after being made aware of the Debtor's bankruptcy filing, retracted the letter.

*[Signature page follows]*

---

[3] A true and correct copy of the Debtor's notification is attached hereto as <u>Annex 2</u>.

[4] Inmoprisa informally offered to provide a few additional days after April 10, 2023, for the Debtor to close the transaction, but once it became clear that closing would not occur and that the Debtor wanted significant additional time to close, Inmoprisa issued the Notice of Default, which is attached hereto as <u>Annex 3</u>.

[5] A true and correct copy of the Correspondence is attached hereto as <u>Annex 4</u>.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: May 4th , 2023

_____
Gloria Cedeño de Hoces

**<u>Annex 1</u>**

The Contract

EXECUTION COPY

## CONTRACT OF SALE

CONTRACT OF SALE (this "**Contract**") made as of the 23rd day of February, 2023 between INMOPRISA, USA, Inc., a New York corporation, having an address at c/o John A. Goodman, Esq., 258 Kitchawan Road, South Salem, New York 10590 ("**Seller**") and RACIV CORP., a New York corporation, having an address at c/o Macklowe Properties, 400 Park Avenue, New York, New York 10022 ("**Buyer**").

## W I T N E S S E T H:

1.    Sale; Definitions.

1.1    (a)    Seller agrees to sell, assign, convey and transfer to Buyer, and Buyer agrees to purchase from Seller the Premises (as defined in Section 1.3) together with the Related Assets for the price and on the terms hereafter stated.

(b)    The Purchase Price for the Premises is **$22,500,000.00**, to be paid as follows:

(i)    **$3,000,000.00** at the execution of this Contract paid to Seller in United States dollars via wire transfer of immediately available funds to the wiring instructions set forth below: ("**Seller's Account**")

> Bank: Chase Bank
> Account Number: 235525992
> Account Name: John A. Goodman, Esq. Attorney Trust Account
> Routing Number: 021000021

(ii)    the balance of the Purchase Price at Closing in cash.

1.2    All Closing cash payments shall be made by Buyer by wire transfer in United States dollars to the Escrowee's account and by Escrowee to Seller's Account or to such other bank account designated by Seller or as Seller shall otherwise direct in writing.

1.3    For the purposes of this Contract, unless the context shall otherwise indicate, the terms set forth below shall be defined as follows:

"**Buyer**" means and shall include an assignee in accordance with and subject to Section 11.

"**Closing**" shall mean the consummation of the transactions referred to in this Contract which shall occur upon the delivery of the deed described in Section 7.3(a), the delivery of the other documents described in Section 7 and the payment of the Purchase Price as provided in Section 1.1(b). Closing shall occur on or about April 10, 2023, provided in no event shall such date be later than 45 days following signing of this Contract by both parties, except as the same may be extended pursuant to this Contract. **Time shall be of the essence with respect to the obligation of Buyer to purchase the Premises on the Closing Date.**

"**Closing Date**" means the date that the Closing occurs under this Contract.

"**Deposit**" shall mean the sum of the payment of **$950,000.00** as provided in Section 1.1(b), together with any interest collected thereon prior to the release of same to Seller as provided in Section 10. The Deposit shall be deemed fully earned by Seller as of the date hereof as consideration for Seller entering into this Contract and shall not be refundable to Buyer for any reason except as provided in Section 21.2 below.

"**Effective Date**" shall mean the date on which both parties shall have signed this Contract and Buyer's or Buyer's counsel's receipt of a fully executed Contract (which may be delivered by .pdf).

"**Escrowee**" or "**Escrow Agent**" shall mean John A. Goodman, Esq.

"**Good Title**" shall mean good and insurable title in fee simple, free and clear of all liens, encumbrances, agreements, restrictions and burdens, except for Permitted Encumbrances as required by Article 4.

"**Governmental Authority**" shall mean the municipal, district, state and Federal governments, and agencies, authorities, courts and officers of any of them having jurisdiction of the Premises.

"**Hazardous Materials**" shall have the meaning set forth in Section 2.1(b).

"**Improvements**" shall mean the buildings, structures and other facilities on the Land, together with all right, title and interest of Seller, if any, in and to any fixtures, equipment, machinery, apparatus, appliances owned by Seller.

"**Land**" shall mean that certain parcel of land lying and being in the City, County and State of New York, designated as Lot 61 in Block 1287 on the Tax Map of the City of New York, County of New York, and known as 14 East 52nd Street, New York, New York, which land is more particularly described in Schedule A annexed hereto.

"**Legal Requirements**" shall mean all laws, statutes, codes, ordinances, acts, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all Governmental Authorities in force on the date of this Contract.

"**Permitted Encumbrances**" shall mean the matters, exceptions and state of facts affecting title to the Premises determined as provided in Section 2.2.

"**Premises**" shall mean the Land and the Improvements located thereon including all right, title and interest of Seller, if any, in and to the rights, benefits, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances thereon or in any way appertaining thereto, including all mineral rights, development rights, air and water rights.

"**Purchase Price**" shall mean the sum referred to in Section 1.1(b).

"**Related Assets**" shall mean, to the extent owned and in possession by Seller, (a) all tangible personal property, owned by Seller, now or hereafter located on and used exclusively in the operation, ownership or maintenance of the Premises, (b) all intangible personal property, owned by Seller, assignable at no cost to Seller, and used exclusively in connection with the operation, ownership or maintenance of the Premises, (c) all certificate(s) of occupancy with respect to the Land and Improvements, and all other consents, authorizations, variances, waivers, licenses, permits, certificates and approvals from any Governmental Agency with respect to the Premises now or hereafter existing (collectively, the "**Permits**"), (d) all assignable warranties, guaranties and contract rights, if any, with respect to the Premises (collectively, the "**Warranties**"), (e) the plans and specifications, surveys, renderings and other architectural and engineering drawings for the Premises, if any, (f) all of Seller's transferable right and interest in all keys, plans, specifications, reports, tests and other materials owned by or in the possession of Seller exclusively pertaining to the operation of the Premises (collectively, the "**Books and Records**"), subject in all cases to any copyrights and other proprietary rights therein of third parties and without representation or warranty concerning the contents (including, without limitation, the completeness and accuracy thereof) thereof.

"**Seller**" shall have the meaning set forth in the preamble hereof.

"**Seller's Account**" shall have the meaning in Section 1.1(b).

"**Service Contract**" shall mean any written management, rental, telecommunications, brokerage or other service or supply contract or agreement entered into or assumed by Seller with respect of the Premises.

"**Title Commitment**" is defined in Section 2.2.

"**Title Company**" shall mean First Nationwide Title Agency, LLC.

2.    State of the Property; Acknowledgments.

2.1    (a)    Upon execution of this Contract, Buyer acknowledges that Buyer shall, for all purposes, be deemed to have inspected, or caused to be inspected, the Premises and independently investigated, analyzed and appraised the value and the profitability thereof and is fully familiar and satisfied with the condition and repair of the Premises, the value, income, expenses and operation thereof, applicable land use ordinances and regulations, legal compliance and the uses which may be made of the Premises, and any other matter with respect thereto.

(b)    Certain materials and substances that were in common use without regulation at and since the original construction of the Improvements are now deemed to be hazardous materials or hazardous substances under applicable Legal Requirements or the use, or the method of use, of such items may now be prohibited or regulated, that some of those materials and substances may have been used in the original construction of the Improvements or the subsequent maintenance of the Premises, that prior owners of the Premises or adjacent property may have stored, released, transported or otherwise disposed of material on such properties deemed to be hazardous substances under applicable Legal Requirements, that certain natural conditions, including without limitation radon and mold, mildew, fungi, or bacterial matter, including any substance produced by, emanating from, or arising out of any such

biological contaminants, that may be health hazards may be present and may be further aggravated by the construction and repair of the Improvements (all or any of the foregoing, "**Hazardous Materials**"), and that, Buyer was solely responsible for all investigation or inquiry into such items prior to the Effective Date and Seller shall not be responsible to Buyer for any costs of removal and remediation (including consequential damages) of any such Hazardous Materials.

(c)    Neither Seller nor any agent or representative of Seller has made, and Seller is not liable for or bound in any manner by, any express or implied warranties, guarantees, promises, statements, inducements, representations or information pertaining to the Premises, or any part thereof, the physical condition, legal compliance, income, expenses or operation thereof, the uses which can be made of the Premises or any other matter or thing with respect thereto, and that without limiting the foregoing, except as expressly set forth in this Contract, Seller is not liable for or bound by (and Buyer has not relied upon) any verbal or written statements, representations, real estate brokers' "set ups" or any other information respecting the Premises furnished by Seller or any broker, employee, agent, consultant or other person representing or purportedly representing Seller.

(d)    No responsibility has been assumed by Seller as to the condition or repair of the Premises or the value thereof or as to any other fact which has or might affect the Premises or the condition, repair, value, expense of operation or income potentials thereof.

(e)    BUYER, BY RECORDATION OF THE DEED, SHALL ACCEPT THE PREMISES "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE CLOSING DATE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER, INCLUDING, WITHOUT ANY LIMITATION AS TO ITS CONDITION, FITNESS FOR ANY PURPOSE OR MERCHANTABILITY OR COMPLIANCE WITH LEGAL REQUIREMENTS, OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS MAY BE EXPRESSLY SET FORTH IN THIS CONTRACT.  BY CLOSING TITLE PURSUANT TO THIS CONTRACT, BUYER SHALL INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS FROM AND AGAINST ANY AND ALL MATTERS RELATING TO THE CONDITION OF THE PREMISES AS OF THE DAY OF CLOSING AND ARISING ON OR FOLLOWING THE DAY OF CLOSING, WHICH OBLIGATION SHALL SURVIVE THE CLOSING AND THE RECORDATION OF THE DEED.

[Initial]_____ [Initial]_____
       Buyer                                         Seller

2.2    Prior to the Effective Date Buyer has obtained, at Buyer's sole cost and expense a title commitment in the amount of the Purchase Price issued by the Title Company (the "**Title Commitment**"), setting forth the status of the title to the Premises, with copies of all documents and other items referred to in the Title Commitment as exceptions, a copy of which has been delivered to Seller by Buyer.  Buyer shall deliver upon receipt, or cause the Title Company to deliver simultaneously with delivery to Buyer, to Seller copies of any update to the Title Commitment.  Buyer shall notify Seller within ten (10) business days after the Effective Date with respect to Buyer's objection to any exceptions, defects or objections set forth in any such

update to the Title Commitment (such objections being referred to as the "**Title Objections**"). Notwithstanding the foregoing, Buyer shall not be obligated to notify Seller of any matter shown on the Title Commitment or update thereto delivered to Seller's counsel which evidences (a) any mortgages secured by the Premises and related UCC filings and assignments of leases and rents and other evidence of indebtedness secured by the Premises, (b) all tax liens for delinquent real property taxes and mechanics' and materialmen's liens for work and (c) other monetary liens or judgments entered against Seller (and not caused by Buyer) that may be removed or cured by the payment of an ascertainable sum (each such matter, a "**Must Cure Item**"), and Seller shall be obligated to remove or take such action as is necessary for Buyer's title company to insure Buyer against all such Must Cure Items without additional payment or premium. Other than a Must Cure Item, if Buyer does not deliver a Title Objection within the aforesaid time periods, Buyer shall be deemed to have waived any such objection to such exceptions, defects, objections, or matters and they shall be deemed to be Permitted Encumbrances. Notwithstanding the foregoing, the matters set forth on Schedule 2.2 shall be deemed Permitted Encumbrances. Seller shall notify Buyer within five (5) business days after receipt of Buyer's notice of Title Objections whether it will be willing or able to cure or remove any such Title Objections. If Seller shall notify Buyer that it is not willing or able to cure or remove any such Title Objections (other than Must Cure Items), then Buyer shall have the right to exercise a Termination Option on account of that matter by delivering notice to Seller thereof within five (5) business days after receipt of Seller's notice, in which event, Escrowee or Seller, as applicable, shall promptly return the portion of the Deposit held by Escrowee or Seller, as applicable, to Buyer, this Contract shall be of no further force and effect except for those provisions which expressly survive the termination hereof. If Buyer shall fail to deliver such notice, Buyer shall be deemed to have waived its objection to any such Exception and it shall be deemed to be a Permitted Encumbrance.

3.    Representations and Covenants.

    3.1    Seller represents to Buyer:

        (a)    Seller (i) is a duly organized and validly existing corporation, existing under the laws of the State of New York and is, or shall at Closing be, in good standing under the laws of the State of New York (ii) is, and shall at Closing be, duly bound by the actions and execution hereof by individual(s) who executed this Contract on Seller's behalf; and (iii) has, and shall at Closing have, the authority and power to enter into this Contract and to consummate the transaction provided for herein. The execution and delivery by Seller of, and the performance and compliance by Seller with the terms and provisions of, this Contract do not violate any of the terms, conditions or provisions of its organizational documents of Seller.

        (b)    Seller is not a party and has not knowingly assumed any Service Contracts that will be binding on Buyer after the Closing.

        (c)    Seller is (i) not listed on the Specially Designated Nationals List (the "**List**") maintained by the U.S. Department of the Treasury Office of Foreign Assets Control ("**OFAC**"), and, to Seller's knowledge, none of its direct and indirect nonpublicly traded stockholders, members, partners and other investors are listed on the List, (ii) not a person who has been determined by competent authority to be subject to the prohibitions contained in

Executive Order No. 133224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC and/or in any enabling legislation or other Executive Orders in respect thereof, (iii) not owned or controlled by, nor does it act for or on behalf of, any person on the List or any other person who has been determined by competent authority to be subject to the prohibitions contained in Executive Order No. 133224 (Sept. 23, 2001) or similar prohibitions contained in the rules and regulations of OFAC or any enabling legislation or other Executive Orders in respect thereof, (iv) in material compliance with all laws, statutes, rules and regulations of any federal, state or local Governmental Agency in the United States of America that is applicable to it, including without limitation being in strict and full compliance with the requirements of Executive Order No. 133224 (Sept. 23, 2001) and other similar requirements contained in the rules and regulations of OFAC and in any enabling legislation or other Executive Orders in respect thereof.

3.2     Buyer represents to Seller:

(a)     Buyer (i) is a duly organized and validly existing corporation, existing under the laws of the State of its incorporation and is, or shall at Closing be, in good standing under the laws of the State of New York (ii) is, and shall at Closing be, duly bound by the actions and execution hereof by individual(s) who executed this Contract on Buyer's behalf; and (iii) has, and shall at Closing have, the authority and power to enter into this Contract and to consummate the transaction provided for herein.  The execution and delivery by Buyer of, and the performance and compliance by Buyer with the terms and provisions of, this Contract do not violate any of the terms, conditions or provisions of its organizational documents of Buyer.

(b)     Buyer is (i) not listed on the List maintained by OFAC, and, to Buyer's knowledge, none of its direct and indirect nonpublicly traded stockholders, members, partners and other investors are listed on the List, (ii) not a person who has been determined by competent authority to be subject to the prohibitions contained in Executive Order No. 133224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC and/or in any enabling legislation or other Executive Orders in respect thereof, (iii) not owned or controlled by, nor does it act for or on behalf of, any person on the List or any other person who has been determined by competent authority to be subject to the prohibitions contained in Executive Order No. 133224 (Sept. 23, 2001) or similar prohibitions contained in the rules and regulations of OFAC or any enabling legislation or other Executive Orders in respect thereof, (iv) in material compliance with all laws, statutes, rules and regulations of any federal, state or local Governmental Agency in the United States of America that is applicable to it, including without limitation being in strict and full compliance with the requirements of Executive Order No. 133224 (Sept. 23, 2001) and other similar requirements contained in the rules and regulations of OFAC and in any enabling legislation or other Executive Orders in respect thereof.

4.     Title, Title Insurance and Closing Conditions.

4.1     If at Closing Seller is unable to convey to Buyer Good Title to the Premises subject to and in accordance with the provisions of this Contract or is unable to satisfy the conditions to Buyer's obligations under Section 6.1 of this Contract, then Seller shall be entitled to a reasonable adjournment (not to exceed sixty (60) days after the scheduled day of Closing) to

remove any defects in, or objections to, Good Title or to fulfill any condition to the performance of this Contract. Seller shall perform any action required by Section 2.2 or covered by Seller's notice referred to in Section 2.2, but except as so provided, Seller shall not be required to take or bring any action or proceeding or any other steps to remove any other defects in, or other objections to, title or to fulfill any other condition to the performance of this Contract or to expend any moneys therefor.

4.2    Buyer may accept such title as Seller can convey without reduction of the purchase price or any credit or allowance on account thereof or other claim against Seller. The recordation of the deed to Buyer shall be deemed to be full performance and discharge of every agreement and obligation in Sections 2.2 and 4.1 and every condition precedent to Buyer's obligations in Section 6.1.

4.3    If the Premises shall at the time of Closing be subject to any liens, encumbrances or other title exceptions that Buyer has objected to as provided in Section 2.2, those matters shall be deemed a Permitted Encumbrance if the title insurer will (or any reputable title insurer acting reasonably would) issue or bind itself to issue a policy at Closing which will omit same as an exception to coverage.

5.    Casualty and Condemnation.

5.1    The risk of any fire or other casualty shall be assumed solely by Buyer until Closing, and in no event shall Buyer be entitled to exercise a Termination Option in respect of any such fire or other casualty.

5.2    The risk of a taking of the Premises or any part thereof by eminent domain shall be assumed solely by Seller until Closing, provided, however, that in the event of a taking causing a loss in an amount equal to or less than 25% of the Purchase Price, this Contract shall remain in force without reduction of the Purchase Price and the sum of any condemnation award if received by Seller shall be paid over to Buyer at Closing (or, if that amount has not been collected by Seller before Closing, Seller's rights to same, subject to the terms of the Lease, shall be assigned to Buyer).

5.3    If a taking shall cause a loss in an amount more than 25% of the Purchase Price, then Buyer may exercise a Termination Option within ten (10) days after Seller shall give Buyer notice of the particular events and the Deposit shall be returned to Buyer by Escrow Agent or Seller, as applicable. If Buyer does not timely exercise this Termination Option, the parties will proceed as provided in Section 5.2 with respect to a taking causing a loss in an amount equal to or less than 25% of the Purchase Price.

5.4    Seller shall promptly notify Buyer of any condemnation or casualty affecting the Premises.

5.5    IF ANY EVENT DESCRIBED IN SECTION 5 SHALL OCCUR, THE PROVISIONS OF SECTION 5 SHALL CONTROL, AND THE UNIFORM VENDOR AND PURCHASER RISK ACT, §5-1311 OF THE GENERAL OBLIGATIONS LAW, OR ANY SUCCESSOR STATUTE THERETO, OR SIMILAR STATUTE SHALL NOT BE APPLICABLE.

6.    <u>Conditions Precedent</u>.

6.1    As conditions precedent to Buyer's obligation to purchase the Premises and to perform its other obligations under this Contract:

(a)    Seller shall have delivered the documents required by <u>Section 7.3</u> of this Contract.

(b)    The representations made by Seller in this Contract shall be true and correct in all respects.

6.2    As conditions precedent to Seller's obligation to transfer the Premises:

(a)    No event for which Seller has a Termination Option shall have occurred unless same shall have been waived or deemed waived.

(b)    Buyer shall have made the payments provided in this Contract and executed the documents referred to in this Contract.

7.    <u>Escrow and Closing</u>.

7.1    Seller and Buyer agree to use commercially reasonable efforts to perform with reasonable dispatch the acts to be done by each of them to satisfy the conditions precedent to the Closing.

7.2    Concurrently with the execution of this Contract and the deposit of the sum set forth in <u>Section 1.1(b)(ii)</u>, each party shall execute such separate escrow instructions with the Escrowee as may be reasonably required by the Escrowee for the administration of the Deposit (as provided in Section 10).

7.3    Seller shall deliver the following:

(a)    A bargain and sale deed without covenants against grantor's acts conveying the Premises to Buyer in the form of <u>Schedule 7.3(a)</u>, subject to Permitted Encumbrances and other matters of record, executed in form for recording.

(b)    An assignment, in the form of <u>Schedule 7.3(b)</u>, of Seller's rights under, and to the extent assignable, the Related Assets and; and at the Premises (or the Seller's managing agent's office) the documents in Seller's possession relating to each of the foregoing.

(c)    An affidavit containing the information required by Section 1445 of the Internal Revenue Code to establish that Seller is not a foreign person for purposes of such Section.

(d)    New York State Transfer Tax Return, New York City Transfer Tax Return in ACRIS format.

(e)     A title affidavit and other items customarily required by the Title Company.

7.4     Buyer shall execute and deliver the following:

(a)     New York State Transfer Tax Return, New York City Transfer Tax Return in ACRIS format and bank checks or wire transfer of amounts required to pay the same together with any amount necessary to "gross up" such transfer taxes for any additional consideration deemed to be made to Seller in addition to the Purchase Price in respect of the payment by Buyer of such transfer taxes.

(b)     Any other documents expressly required by the terms of this Contract.

7.5     Each party shall deliver to the other party and to the Escrowee at Closing such duly executed and acknowledged or verified certificates, affidavits and other documents respecting the power and authority to perform the obligations hereunder and as to the due authorization thereof by appropriate trust, corporate, partnership, limited liability company or other applicable proceedings and as to the authority of the officer, partner or other representatives acting for it, as counsel for the other party or the Title Company may reasonably request.

7.6     The Escrowee shall serve as the "real estate reporting person" (as such term is defined in Section 6045(e) of the Internal Revenue Code of 1986, as amended) and shall file the requisite Form 1099-S with the Internal Revenue Service in accordance with said Section 6045(e) and the regulations issued thereunder. This Contract shall constitute the designation agreement described in those regulations, the name and address of Seller as transferor and Buyer as transferee in the transaction contemplated hereby appear in Section 12 hereof (as amended by any notice given under Section 12 and, in case of any permissible assignment by Buyer, by the notice of such assignment) and Seller, Buyer and Escrowee agree to retain a copy of this Contract for a period of four (4) years following the end of the calendar year in which the Closing occurs. The provisions of this paragraph shall survive the Closing.

8.     Adjustments.

8.1     The following shall be apportioned as of 11:59 p.m. on the day prior to Closing Date (with the Closing Date being the responsibility of Buyer) based upon the number of calendar days in the measuring period:

(a)     (i)     Real and personal property taxes and special assessments. If Closing shall occur before the taxes for the current year are fixed for the Premises, the apportionment of the tax shall be made on the basis of the taxes for the next preceding tax year and shall be finally adjusted (after giving effect to all discounts available for early payment when the tax bill for the current year is received) and any necessary payments shall be made at such time as the tax bill for the current year is issued; provided, however, that no adjustment shall be made for any increase in real estate taxes occurring by virtue of supplemental taxes imposed on account of the sale of the Premises. If at any time, whether before or after Closing, the Premises are reassessed and such reassessment results in a refund of taxes or special assessments paid for any period prior to Closing, such refund shall be the sole property of Seller, and to the extent that

Buyer shall receive the same, either directly or indirectly, Buyer shall transmit such refund to Seller. The provisions of this paragraph shall survive the Closing.

(ii)     If any special assessments are payable in installments, Seller shall only be responsible for payment of installments to the extent accrued prior to Closing (including the pro rated portion of the installment payable in the current year).

(b)     Utility charges, if any, including water and sewer charges, except that where practicable, utility readings will be taken on the day prior to the Closing, and Seller shall pay the charges for utility services based on such reading, Buyer paying charges for all such utility services thereafter.

8.2     Buyer shall pay for all title search costs (including, without limitation, the abstracting and title search costs), the cost of a survey of the Premises and any update thereto, and for the cost of its title insurance premiums, all endorsements, extended coverage and all recording costs. Buyer shall pay the cost of the recording of the deed. Seller shall pay any and all transfer taxes due and payable in connection with the transfer of the Premises. The parties shall pay any costs as expressly provided elsewhere in this Contract and shall adjust all other closing charges in accordance with the custom in New York County.

8.3     In the event that any of the prorations or adjustments described in this <u>Section 8</u> is based upon estimated or erroneous information, then the parties shall make between themselves any equitable adjustment required by reason of any difference between such estimated or erroneous amounts and the actual amounts of such sums. The provisions of this <u>Section 8</u> shall survive the Closing.

9.     <u>Brokerage</u>.

Each of Buyer and Seller represent that no broker has been involved with the negotiation of this Contract and the purchase of the Premises hereto other than Avison Young – New York LLC ("Broker"), and there are no other persons entitled to a commission in connection with this transaction. Buyer agrees to indemnify Seller against any claims of and liabilities to any person for brokerage commissions, finder's fees or other remuneration arising from this Contract or the transaction contemplated by this Contract by reason of Buyer's acts. Seller agrees to indemnify Buyer against any claims of and liabilities to any person for brokerage commissions, finder's fees or other remuneration arising from this Contract or the transaction contemplated by this Contract by reason of Seller's acts. At closing, Seller shall be responsible to pay the broker commission to Broker in accordance with a written brokerage agreement between Seller and Broker. The provisions of this Section 9 shall survive the Closing.

10.     <u>Escrow Provisions</u>.

10.1     Seller and Buyer hereby appoint Escrowee to serve as such pursuant to the terms of this Contract. The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and as such shall not be deemed to be the agent of either of the parties. The Escrowee shall not be liable for any good faith error of judgment, any act taken or omitted by it, or any mistake in fact or law, except for its own willful misconduct or gross negligence.

10.2    Buyer shall pay the sum or sums, as applicable, to be paid under Section 1.1(b) by wire transfer to Escrowee.  As soon as practicable after collection, Escrow Agent shall deposit each sum constituting the Deposit in an interest-bearing escrow account. Escrowee shall apply the Deposit as expressly provided in this Contract.

10.3    The duties of Escrowee shall be determined solely by the express provisions of this Contract.  The Escrowee shall be entitled to act on or rely upon any written notice, direction, request, waiver, consent, receipt or other document which appears to have been signed or presented by the party or parties entitled to execute or deliver such document, and the Escrowee shall have no duty to inquire of or investigate the authorization, signature or authenticity of such person or document.  If for any reason the Closing does not occur, the Escrow Agent shall deliver the Deposit to Seller or Buyer only upon receipt of a written demand therefor from such party, subject to the following provisions of this Section 10.3.  If for any reason the Closing does not occur and either party makes a written demand upon the Escrowee for payment of the Deposit, the Escrowee shall give written notice to the other party of such demand.  If the Escrowee does not receive a written objection from the other party to the proposed payment within ten (10) days after the giving of such notice, the Escrowee is hereby authorized to make such payment.

10.4    If the Escrowee does receive such written objection within such period, the Escrow Agent shall continue to hold such amount until otherwise directed by written instructions signed by Seller and Buyer or a final judgment of a court of competent jurisdiction.  If there is any dispute as to which party is entitled to the Deposit prior to release by Escrowee, Escrowee may hold the Deposit until receipt of a written authorization signed by the parties or a final judgment of a court of competent jurisdiction directing the disposition of the Deposit.  In the absence of such authorization, the parties authorize Escrowee, without creating any obligation on the part of Escrowee, if this Contract or the Deposit becomes involved in litigation prior to the release of the Deposit, to deliver the Deposit to the clerk of the court in which the litigation is pending or, if it is threatened with litigation, to interplead all interested parties in the court of general jurisdiction in the county in which the Premises are located and to deliver the Deposit to the clerk of that court; and upon such delivery, Escrowee shall be fully relieved and discharged of any further responsibilities under this Contract.

10.5    The parties to the Contract other than the Escrowee (collectively referred to as the "**Indemnitors**") jointly and severally agree to indemnify each of the Escrowee and its members, employees and agents (collectively referred to as the "**Indemnitees**") against, and hold them harmless of and from, any and all loss, liability, cost, damage and expense, including, without limitation, reasonable counsel fees (including those of the Escrowee computed at its regular hourly rates), which the Indemnitees may suffer or incur by reason of any action, claim or proceeding brought or threatened to be brought, whether by any party to this Contract or by any other person or entity, against any Indemnitee or in which any Indemnitee may become involved arising out of or relating directly or indirectly in any way to the Contract or any transaction to which the Contract directly or indirectly relates (including any action, claim or proceeding by the Escrowee to enforce any indemnity obligation or any other obligation of any party to this Contract).  If the indemnification provided for in this paragraph for any reason is held to be unavailable, the Indemnitors shall contribute such amounts as are, as between the Indemnitors, just and equitable to pay to the Indemnitees or to reimburse them for, the aggregate of any and

all losses, liabilities, costs, damages and expenses, including counsel fees, incurred by the Indemnitees as a result of or in connection with, and any amount paid in settlement of, any action, claim or proceeding arising out of or relating directly or indirectly in any way to the Contract or any transaction to which the Contract directly or indirectly relates. The provisions of this paragraph shall survive any termination of the Contract, whether by disbursement of the sums held in escrow, or otherwise.

11.    Assignments.

11.1    In the event of any assignment, Buyer shall not be released from its obligations under this Contract upon any assignment and Buyer's obligations shall remain in full force and effect.

12.    Notices.

All notices, requests, consents and other communications required or permitted to be delivered hereunder shall be in writing and shall be delivered by Federal Express or other national air courier (or by e-mail transmittal to counsel for the receiving party provided same is sent the same day by to the receiving party by Federal Express or other national air courier, as follows):

To Escrowee at:            John A. Goodman, Esq.
                           258 Kitchawan Road
                           South Salem, New York 10590
                           Phone: (914) 523-2467
                           E-mail: Jagoodmanlaw@gmail.com

To Buyer at:               The address first above given.

With a copy to:            Goldberg Weprin Finkel Goldstein LLP
                           125 Park Avenue, 12th Floor
                           New York, New York 10017
                           Attention: Andrew W. Albstein, Esq.
                           Email: aalbstein@gwfglaw.com; swolf@gwfglaw.com

To Seller at:              The address first above given
                           Attn:  Gloria Cedeño de Hoces
                           Phone No.: 34 607 611

With a copy to:            John A. Goodman, Esq.
                           258 Kitchawan Road
                           South Salem, New York 10590
                           Phone: (914) 523-2467
                           E-mail: Jagoodmanlaw@gmail.com

Any party hereto may, from time to time, designate any other address to which such notice, request, consent or other communication addressed to it shall be sent. All such

communications shall be effective on delivery. Counsel for any party may give notices to the other party with the same effect as if given by the party.

13.    Expenses.

Whether or not the transactions contemplated under this Contract are consummated, each party hereto shall pay his own expenses incident to the preparation and performance of this Contract, including, without limitation, attorneys' fees.

14.    Intentionally omitted.

15.    Entire Agreement.

This Contract (including all schedules annexed hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Contract may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by his agent duly authorized in writing or as otherwise expressly permitted herein. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto.

16.    Waivers; Extensions; Business Days.

No waiver of any breach of any agreement or provisions herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provisions herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. If the day for performance of any action described in this Contract shall fall on a Saturday, Sunday or a day on which the banks are closed in the State in which the Premises are located, the time for such action shall be extended to the first business day after such Saturday, Sunday or day on which the banks are closed.

17.    No Recording.

The parties each agree that neither this Contract nor any memorandum or notice thereof shall be recorded except that the parties shall execute and have acknowledged, and Buyer shall be permitted, at Buyer's cost and expense, to record in the real property records with respect to the Premises, a Memorandum of Contract in form annexed hereto as Schedule 17(a), provided that simultaneously with the execution of said Memorandum of Contract, Buyer shall execute, have acknowledged and deliver to Escrowee a Termination of Memorandum of Contract in form annexed hereto as Schedule 17(b) (the "Termination of Memorandum"). Escrowee shall hold said Termination of Memorandum during the pendency of this Contract. If this Contract is terminated, Escrowee shall record same in said real property records and Buyer shall be responsible for the costs thereof, which obligation shall survive the termination of this Contract.

18.    Counterparts; Captions.

This Contract may be executed in counterparts, each of which shall be deemed an original and may be transmitted by .pdf or similar electronic means to counsel for the respective parties and shall be deemed originals. The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

19.    Pronouns; Joint and Several Liability.

All pronouns and nouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require. If Buyer consists of two or more parties, the liability of such parties shall be joint and several.

20.    Claims.

Whenever any party shall learn through the filing of a claim or the commencement of a proceeding by a third party or otherwise of the existence of any liability for which another party is or may be responsible under this Contract, such party shall notify the other party promptly and furnish such copies of documents (and make originals thereof available) and such other information as such party may have which may be used or useful in the defense of such claims and shall afford said other party full opportunity to defend same in the name of any party and shall generally cooperate with the other party in the defense of any such claims.

21.    Default; Limitation of Liability.

21.1    If, on or before the Closing Date, (i) Buyer is in default of any of its obligations hereunder, or (ii) any of Buyer's representations or warranties are, in the aggregate, untrue, inaccurate or incorrect in any material respect, or (iii) the Closing otherwise fails to occur by reason of Buyer's failure or refusal to perform its obligations hereunder in a prompt and timely manner, and any such circumstance described in any of clauses (i), (ii) or (iii) continues for five (5) business days after written notice from Seller to Buyer, which written notice shall detail such default, untruth or failure, as applicable, then Seller may elect to (a) terminate this Contract by written notice to Buyer, promptly after which the Deposit shall be paid to Seller as liquidated damages and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Contract, or (b) waive the condition and proceed to Closing.

21.2    If, at the Closing, (i) Seller is unable to convey to Buyer Good Title to the Premises as required by Article 4 hereof or (ii) the Closing otherwise fails to occur by reason of Seller's failure or refusal to satisfy the conditions to Closing set forth in Section 6.1, and any such circumstance described in any of clauses (i) or (ii) continues for ten (10) business days after written notice from Buyer to Seller (or for such longer period to which Buyer shall agree), which written notice shall detail such default, then Buyer shall have the right to elect, as its sole and exclusive remedy, to exercise a Termination Option, in which event Escrowee or Seller, as applicable, shall promptly return the Deposit to Buyer, this Contract shall be of no further force and effect except for those provisions which expressly survive the termination hereof. Notwithstanding anything to the contrary contained herein, in the event Buyer exercises a Termination Option hereunder due to a default of Seller hereunder for reason of Seller's willful default of its obligations hereunder, Seller shall reimburse Buyer, as Buyer's sole recoverable

damages (but without limiting its right to receive a refund of the Deposit), its direct and actual out-of-pocket expenses and costs (documented by paid invoices to third parties), which damages shall not exceed $20,000 in the aggregate. Buyer acknowledges and agrees that except as expressly set forth in this <u>Section 21.2</u>, Buyer shall have no right to exercise a Termination Option and receive a return of the Deposit, and in all other cases Buyer shall be obligated to proceed to Closing and pay the Purchase Price. Buyer shall not be entitled to any other remedy for damages or otherwise which it may have at law or in equity as a consequence of any such failure to effect the Closing.

21.3    BUYER AND SELLER HEREBY ACKNOWLEDGE AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF DEFAULT BY BUYER TO PURCHASE THE PREMISES WOULD BE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THE DEPOSIT (AS DEFINED IN <u>SECTION 1.3</u>), IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THE TRANSACTION PROVIDED FOR IN THIS CONTRACT FAILS TO CLOSE BY REASON OF BUYER'S DEFAULT. IF BUYER SHALL DEFAULT, SELLER MAY, AT SELLER'S OPTION, EXERCISE A TERMINATION OPTION AND ESCROWEE SHALL PAY OVER THE DEPOSIT TO SELLER (OR THE DEPOSIT SHALL BE RETAINED IF HELD BY SELLER OR PREVIOUSLY PAID OVER) AS LIQUIDATED DAMAGES, AND IN SUCH CASE THE RETENTION OF THE DEPOSIT SHALL BE THE SOLE REMEDY OF SELLER (EXCEPT FOR ANY DEFAULTS UNDER <u>SECTION 9</u>).

[Initial]_____    [Initial]_____
Buyer                                    Seller

21.4    This Contract is executed and made on behalf of Seller and Buyer by their respective officers, not individually, but solely in their representative capacity, and none of the shareholders, directors and officers of the Seller or Buyer or any employee or agent of thereof shall be held to any personal liability, nor shall resort be had to its private property for the satisfaction of any claim against or obligation of Seller or Buyer in connection with this Contract but only the property of Seller shall be bound.

22.    <u>Governing Law</u>.

The terms of this Contract including, without limitation, the escrow provisions thereof, shall be governed by and construed in accordance with the laws of the State of New York.

*[Signature page(s) follow]*

IN WITNESS WHEREOF, Seller and Buyer have duly executed this Contract as of the date first above written.

SELLER:    INMOPRISA, USA, Inc.,
a New York corporation

By: _____
Name: GLORIA CEDENO
Title: AUTHORIZED SIGNATORY

BUYER:    RACIV CORP.,
a New York corporation

By: _____
Name: _____
Title: _____

The undersigned accepts appointment as Escrowee, acknowledges receipt of $3,000,000 and agrees to hold it in accordance with and subject to the terms of the foregoing Contract.

ESCROWEE: _John A. Goodman_____
By:    John A. Goodman, Esq.
Title:    Attorney

IN WITNESS WHEREOF, Seller and Buyer have duly executed this Contract as of the date first above written.

SELLER:    INMOPRISA, USA, Inc.,
a New York corporation

By:   _____
Name:
Title:

BUYER:    RACIV CORP.,
a New York corporation

By:
Name:
Title:

The undersigned accepts appointment as Escrowee, acknowledges receipt of $3,000,000 and agrees to hold it in accordance with and subject to the terms of the foregoing Contract.

ESCROWEE:   [_____]
By:   John A. Goodman, Esq.
Title:  Attorney

## SCHEDULE A

### Description of Land

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City of New York, bounded and described as follows:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF FIFTY-SECOND STREET DISTANT 240 FEET EASTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF SAID SOUTHERLY SIDE OF FIFTY-SECOND STREET WITH THE EASTERLY SIDE OF FIFTH AVENUE;

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF FIFTY-SECOND STREET 30 FEET;

THENCE SOUTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN FIFTY-FIRST AND FIFTY-SECOND STREETS;

RUNNING THENCE WESTERLY ALONG SAID CENTER LINE OF THE BLOCK 30 FEET;

THENCE NORTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO FIFTH-SECOND STREET AT THE POINT OR PLACE OF BEGINNING.

Block: 1287
Lot: 61

## SCHEDULE 2.2

### Permitted Encumbrances

1.  Unpaid installments of real estate taxes, assessments, vault charges, water charges and sewer rents and other governmental charges subject to proration as per the Contract.

2.  Rights of utility companies to lay, maintain, install and repair pipes, lines poles, conduits, cable boxes and other equipment and installation, over and under the Premises, without requiring assessments or payments by the owner of the Premises.

3.  Any state of facts that an accurate survey or physical inspection of the Premises would disclose.

4.  Building restrictions and regulations now or hereafter in force, and present and future zoning laws, ordinances, resolutions and regulations of all boards, bureaus, commissions and bodies or any municipal, county, state or federal offices now or hereafter acquiring jurisdiction of the Premises and the use and improvement thereof.

5.  Any violations or notes or notices of violation issued in or by any governmental authority having jurisdiction over the Premises or any sidewalks adjacent or judgments in connection therewith, and any conditions which could result in any such violations and any open applications or permits, notices of repair or liens by any other governmental authority.

6.  Encroachments and projections of walls, foundations, stoops, cellar steps, areas, cornices, trim or other improvements or installations onto the Premises or from the Premises onto adjoining property.

7.  Party walls and party wall rights; beams and beam rights; the possible revocable nature of or lack of right to maintain vaults or other improvements or installations beyond building or property lines; variations between the record lot lines of the Premises and those shown on the tax map; and consents for the erection and maintenance of any structures on, under or above any streets or roads in front of or adjoining the Premises.

8.  Any financing statements, conditional bills of sale, chattel mortgages or security interests filed more than five years prior to the Closing Date and not renewed within said five years, or filed against personal property owned by any tenant or no longer at the Premises.

9.  Unpaid franchise taxes or business or corporation taxes of any corporation or other entity and/or any estate taxes of any prior owner in the chain of title.

## SCHEDULE 7.3(a)

### Form of Bargain and Sale Deed

(see attached)

**Bargain and Sale Deed Without Covenant Against Grantor's Acts**

**INMOPRISA, USA, INC.**

**TO**

[_____],

STREET ADDRESS:    14 East 52nd Street
                   New York, New York

COUNTY:            New York
BLOCK:             1287
LOT:               61

RECORD AND RETURN TO:

[_____]
[_____]
[_____]
Attn: [_____]

726989535.5

# BARGAIN AND SALE DEED WITHOUT COVENANT AGAINST GRANTOR'S ACTS

THIS INDENTURE, made as of this __ day of _____, 2023, by INMOPRISA, USA, Inc., a New York corporation, having an address at c/o [_____] ("**Grantor**") and [_____], a [_____], having an address at _____ ("**Grantee**")

WITNESSETH, that Grantor, for and in consideration of Ten ($10.00) Dollars and other good and valuable consideration paid by Grantee, the receipt whereof is hereby acknowledged, hereby grants and releases to Grantee all that certain plot, piece or parcel of land, together with the buildings and improvements thereon erected, situate, lying and being in the City and County of New York, State of New York, more particularly described on Exhibit A attached hereto and made a part hereof

TOGETHER with all right, title and interest, if any, of the Grantor in an to any streets and roads abutting the above described premises to the center lines thereof, TOGETHER with the appurtenances and all of the estate and rights of the Grantor in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the Grantee forever.

AND, Grantor, in compliance with Section 13 of the Lien Law, covenants that Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first for the purpose of paying the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the undersigned has executed this Bargain and Sale Deed as of the date first above written.

GRANTOR:    INMOPRISA, USA, Inc.,
a New York corporation


By: _____
Name:
Title:

STATE OF _____ )
                       : ss.:
COUNTY OF _____ )

        On the ___ day of _____ in the year 2023, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                _____
                                 Signature and Office of individual
                                 taking acknowledgment

## Exhibit A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City of New York, bounded and described as follows:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF FIFTY-SECOND STREET DISTANT 240 FEET EASTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF SAID SOUTHERLY SIDE OF FIFTY-SECOND STREET WITH THE EASTERLY SIDE OF FIFTH AVENUE;

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF FIFTY-SECOND STREET 30 FEET;

THENCE SOUTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN FIFTY-FIRST AND FIFTY-SECOND STREETS;

RUNNING THENCE WESTERLY ALONG SAID CENTER LINE OF THE BLOCK 30 FEET;

THENCE NORTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO FIFTH-SECOND STREET AT THE POINT OR PLACE OF BEGINNING.


Block: 1287
Lot: 61

## SCHEDULE 7.3(b)

### Assignment and Assumption of Property Rights

ASSIGNMENT AND ASSUMPTION ("Agreement") dated as of this ___ day of _____, _____ between _____, a _____, having an office c/o _____ ("Assignor") and _____, a _____ _____, having an address c/o _____ ("Assignee").

## W I T N E S S E T H:

WHEREAS:

A.    Assignor and Assignee entered into a certain contract dated _____ (the "Contract") pursuant to which Assignor agreed to sell and Assignee agreed to purchase certain real property located at _____ (said real property and improvements thereon being herein collectively referred to as the "Premises"), more particularly described in the Contract.

B.    The Contract provides for the transfer and assignment and assumption of certain interests and rights in addition to the Premises more particularly described therein; and

C.    The Contract provides for the execution of an assignment and assumption covering said rights and interests.

NOW THEREFORE, in consideration of Ten ($10.00) Dollars and other good and valuable consideration, the receipt of which is hereby acknowledged, Assignor hereby assigns to Assignee all of its right, title and interest in and to the following:

To the extent owned by Seller and assignable at no cost to Seller, (a) all intangible personal property, owned by Seller and located on the Land and the Improvements, (b) all certificate(s) of occupancy with respect to the Land and Improvements, and all other consents, authorizations, variances, waivers, licenses, permits, certificates and approvals from any governmental or quasi-governmental authority with respect to the Land and Improvements now or hereafter existing (collectively, the "Permits"), (c) all assignable warranties, representations, guaranties and contract rights, if any, with respect to the Land and Improvements (collectively, the "Warranties"), (d) all trade names and trademarks associated with the Land, including Seller's rights and interests, if any, in the name of the Land, (e) the plans and specifications, surveys, renderings and other architectural and engineering drawings for the Land, if any, (f) any of Seller's contract rights related to the operation, ownership or management of the Land, including maintenance, service, construction, supply and equipment rental contracts, if any, and (g) all of Seller's transferable right and interest in all books, records, tenant data, files, statements, keys, plans, specifications, reports, tests and other materials of any kind owned by or in the possession or control of Seller which are or may be used by Seller in the use and operation of the Premises (collectively, the "Books and Records"), subject in all cases to any copyrights and other proprietary rights therein of third parties and without representation or warranty

concerning the contents (including, without limitation, the completeness and accuracy thereof) thereof (collectively, the "Related Property Rights")

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns from and after the date hereof.

Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any and all claims, losses, costs, damages and obligations arising on or before the date hereof under the Related Property Rights which have been assigned hereby.

Assignee hereby assumes the obligations of Assignor arising after the date hereof and agrees to indemnify and hold Assignor harmless from and against any and all claims, losses, costs, damages and obligations arising after the date hereof under the Related Property Rights which have been assigned hereby.

This Agreement may be executed in counterparts, each of which shall be an original and all of which taken together shall constitute one and the same agreement. This Agreement shall become effective only after each of the parties hereto shall have executed and delivered it to the other.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto executed this Agreement as of the date first above written.

ASSIGNOR: INMOPRISA, USA, Inc.,
     a New York corporation


By: _____
Name:
Title:


ASSIGNEE: [_____],
     a [_____] limited liability company


By: _____
Name: _____
Title: _____

## SCHEDULE 17(a)

### Memorandum of Contract

### MEMORANDUM OF CONTRACT

1.      Contract dated as of _____.

2.      Seller: _____, having an address c/o _____.

3.      Buyer: _____, having an address c/o _____.

4.      Time fixed by the contract for conveyance of title: _____.

5.      Description of property:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City of New York, bounded and described as follows:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF FIFTY-SECOND STREET DISTANT 240 FEET EASTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF SAID SOUTHERLY SIDE OF FIFTY-SECOND STREET WITH THE EASTERLY SIDE OF FIFTH AVENUE;

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF FIFTY-SECOND STREET 30 FEET;

THENCE SOUTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN FIFTY-FIRST AND FIFTY-SECOND STREETS;

RUNNING THENCE WESTERLY ALONG SAID CENTER LINE OF THE BLOCK 30 FEET;

THENCE NORTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO FIFTH-SECOND STREET AT THE POINT OR PLACE OF BEGINNING.

Block: 1287
Lot: 61

*[signature page follows]*

In Witness Whereof, the parties have hereunto executed this Memorandum of Contract this ___ day of _____, 2023

SELLER:     INMOPRISA, USA, Inc.,
            a New York corporation


            By:     _____
            Name:
            Title:

BUYER:      [_____],
            a [_____] limited liability company


            By:     _____
            Name:   _____
            Title:  _____

STATE OF NEW YORK )
                   : ss.:
COUNTY OF NEW YORK )

On the ___ day of _____ in the year 2023, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

STATE OF NEW YORK )
                   : ss.:
COUNTY OF NEW YORK )

On the ___ day of _____ in the year 2023, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

**SCHEDULE 17(a)**

**Termination of Memorandum of Contract**

**TERMINATION OF MEMORANDUM OF CONTRACT**

1.      Contract dated as of _____

2.      Seller: _____, having an address c/o _____.

3.      Buyer: _____, having an address c/o _____

4.      Date of Recording of Memorandum of Contract:  _____, _____, in CRFN _____.

5.      Description of property:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City of New York, bounded and described as follows:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF FIFTY-SECOND STREET DISTANT 240 FEET EASTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF SAID SOUTHERLY SIDE OF FIFTY-SECOND STREET WITH THE EASTERLY SIDE OF FIFTH AVENUE;

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF FIFTY-SECOND STREET 30 FEET;

THENCE SOUTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN FIFTY-FIRST AND FIFTY-SECOND STREETS;

RUNNING THENCE WESTERLY ALONG SAID CENTER LINE OF THE BLOCK 30 FEET;

THENCE NORTHERLY AND PARALLEL WITH THE EASTERLY SIDE OF FIFTH AVENUE 100 FEET 5 INCHES TO FIFTH-SECOND STREET AT THE POINT OR PLACE OF BEGINNING.

Block: 1287
Lot: 61

6.      Termination:   The parties are recording this instrument to evidence of record the termination of the Memorandum of Contract previously recorded.

*[signature page follows]*

In Witness Whereof, the parties have hereunto executed this Termination of Memorandum of Contract this ___ day of _____, 2023.

SELLER:    INMOPRISA, USA, Inc.,
a New York corporation


By:    _____
Name:
Title:

BUYER:    [_____],
a [_____] limited liability company


By:    _____
Name:  _____
Title:   _____

STATE OF NEW YORK        )
                               : ss.:

COUNTY OF NEW YORK  )

On the ___ day of _____ in the year 2023, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                         _____

                                         Signature and Office of individual
                                         taking acknowledgment

STATE OF NEW YORK        )
                                 : ss.:

COUNTY OF NEW YORK  )

On the ___ day of _____ in the year 2023, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                         _____

                                         Signature and Office of individual
                                         taking acknowledgment

**Annex 2**

April 9, 2023 Debtor Notification of Delayed Closing

**Subject:**                     FW: 14 East 52nd Street, NY, NY


---------- Forwarded message ---------
From: **Andrew W. Albstein** <aalbstein@gwfglaw.com>
Date: Sun, Apr 9, 2023 at 10:09 PM
Subject: Re: 14 East 52nd Street, NY, NY
To: John A. Goodman <jagoodmanlaw@gmail.com>
Cc: Stewart Wolf <swolf@gwfglaw.com>, Erica D. Vitanza <evitanza@gwfglaw.com>


John. The contract will control.  That said, I will call in the morning and discuss an extension.

Sent from my iPad



Andrew W. Albstein, Esq.
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor  | New York, New York 10017
aalbstein@gwfglaw.com
O: (212) 221-5700 D: (212) 301-6970 M: (917) 864-4567

This message is intended for the sole use of the addressee, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee you are hereby notified that you may not use, copy, disclose, or distribute to anyone the message or any information contained in the message. If you have received this message in error, please immediately advise the sender by reply email and delete this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

On Apr 9, 2023, at 6:34 PM, John A. Goodman <jagoodmanlaw@gmail.com> wrote:


Andrew, are you aware that time is of the essence and that the failure to close tomorrow is a material default under the contract of sale?

John A. Goodman, Esq.
258 Kitchawan Road
South Salem, New York 10590
914.523.2467
JAGoodmanLaw@gmail.com


On Sun, Apr 9, 2023 at 6:17 PM Andrew W. Albstein <aalbstein@gwfglaw.com> wrote:

John, Erica and Stewart.

The purchaser will not be closing tomorrow.  I will be in touch in the morning to reschedule.

Sent from my iPad



Andrew W. Albstein, Esq.
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor  | New York, New York 10017
aalbstein@gwfglaw.com
O: (212) 221-5700 D: (212) 301-6970 M: (917) 864-4567

This message is intended for the sole use of the addressee, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee you are hereby notified that you may not use, copy, disclose, or distribute to anyone the message or any information contained in the message. If you have received this message in error, please immediately advise the sender by reply email and delete this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

On Apr 8, 2023, at 11:32 AM, Erica D. Vitanza <evitanza@gwfglaw.com> wrote:


John,


I hope you are having a nice holiday weekend. In anticipation of the closing please find the formal assignment of contract. Andy or I will be in touch tomorrow or Monday.


Erica D. Vitanza, Esq.
Goldberg Weprin Finkel Goldstein LLP
125 Park Avenue, 12th Floor  | New York, New York 10017
evitanza@gwfglaw.com
O: (212) 221-5700 D: (212) 301-6981

This message is intended for the sole use of the addressee, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee you are hereby notified that you may not use, copy, disclose, or distribute to anyone the message or any information contained in the message. If you have received this message in error, please immediately advise the sender by reply email and delete this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email has been scanned for spam and viruses. Click here to report this email as spam.

**<u>Annex 3</u>**

April 13, 2023 Inmoprisa Notice of Default

**JOHN A. GOODMAN, ESQ.**
**258 KITCHAWAN ROAD**
**SOUTH SALEM, NEW YORK 10590**
**(914) 523-2467**
**jagoodmanlaw@gmail.com**

VIA EMAIL AND FEDERAL EXPRESS

April 13, 2023

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
125 Park Avenue, 12th Floor
New York, New York 10017
Attention: Andrew W. Albstein, Esq.
Email: aalbstein@gwfglaw.com; swolf@gwfglaw.com

RE:    Contract of Sale
       Inmoprisa USA, Inc. to RACIV Corp.
       Block 1287, Lot 61  14 East 52nd Street, NY, NY 10022

Dear Andrew:

Reference is made to Section 21.1 of that certain Contract of Sale (the "Contract") made as of the 23rd of February, 2023 between Inmoprisa, USA, Inc. ("Seller")  and RACIV Corp. ("RACIV") as such Contract was assigned from RACIV to 14 EAST 52ND STREET DEVCO LLC ("Buyer"), which states:

21.1  If, on or before the Closing Date, (i) Buyer is in default of any of its obligations hereunder, or (ii) any of Buyer's representations or warranties are, in the aggregate, untrue, inaccurate or incorrect in any material respect, or (iii) the Closing otherwise fails to occur by reason of Buyer's failure or refusal to perform its obligations hereunder in a prompt and timely manner, and  any such circumstance described in any of clauses (i), (ii), or (iii) continues for five (5) business days after written notice from Seller to Buyer , which written notice shall detail such default, untruth or failure, as applicable, then Seller may elect to (a) terminate this Contract by written notice to Buyer, promptly after which the Deposit shall be paid to Seller as liquidated damages and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Contract or (b) waive the condition and proceed to Closing.

This letter shall constitute written notice under Section 21.1 of the Contract that the Closing failed to occur and Buyer failed to pay the balance of the Purchase Price to

Seller in cash under Section 1 of the Contract on April 10, 2023, time being of the essence. As such, Buyer is in default of its obligations under the Contract.

Sincerely,

John A. Goodman

Enc.

cc.:    GCedeno,Esq.
        Nathan Sevilla, Esq.

**<u>Annex 4</u>**

April 20, 2023 Debtor Correspondence Staying Inmoprisa from Reselling the Property

# GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP

ATTORNEYS AT LAW

ANDREW W. ALBSTEIN*
STEVEN R. UFFNER
KEVIN J. NASH
IRIS A. ALBSTEIN
BARRY E. ZWEIGBAUM
DOUGLAS TAUS
ROBERT W. LO SCHIAVO°
ELIZABETH SMITH*✝
KATHARINE M. FINCH~
MATTHEW E. HEARLE
AUBREY E. RICCARDI
ANTHONY J. SCHLUR
DANIEL J. SLATZ
STEWART A. WOLF*
YAN LAURENCY
ERIK ZARATIN~

J. TED DONOVAN
SERGIO J. TUERO*
JAY E. SIMENS
BRIAN W. KEMPER
DENA C. KAUFMAN∞
ERICA D. VITANZA*
M. BRIAN CRONK
JESSICA L. SPRAGUE*
NEIL I. ALBSTEIN*
JARED STEINBERG♦
ELLIOT FINK
CYNTHIA M. ALBSTEIN
AMANDA ZIFCHAK

**125 PARK AVENUE**
**12TH FLOOR**
**NEW YORK, N. Y. 10017**
**(212) 221-5700**
**TELECOPIER (212) 730-4518**

ARNOLD I. MAZEL
HARVEY GOLDSTEIN
BENJAMIN C. KIRSCHENBAUM
ROBERT KANDEL
ROBERT F. LINER
(OF COUNSEL)

EMANUEL GOLDBERG (1904 - 1988)
JACK WEPRIN (1930 - 1996)
BENJAMIN FINKEL (1905 - 1986)

*  ALSO MEMBER OF NEW JERSEY BAR
✝  ALSO MEMBER OF MASSACHUSETTS BAR
~  ALSO MEMBER OF CONNECTICUT BAR
∘  ALSO MEMBER OF CALIFORNIA BAR
∞  ALSO MEMBER OF FLORIDA BAR
♦  MEMBER OF OHIO AND PENNSYLVANIA BARS ONLY

April 20, 2023

*Via Email JAGoodmanLaw@gmail.com*
John A. Goodman, Esq.
258 Kitchawan Road
South Salem, New York 10590

**Re:    14 East 52nd Street, New York, New York**

Dear Mr. Goodman:

Please be advised that 14 East 52nd Street Devco LLC, the Purchaser under that certain Contract of Sale dated as of February 23, 2023, has today commenced a voluntary Chapter 11 case under title 11 of the United States Code in the U.S. Bankruptcy Court for the Eastern District of New York.  A copy of the proof of filing is enclosed for your ready reference.

The purpose of the filing as stated in the Local Rule Declaration is to preserve rights under the contract and to protect the deposit.  We intend to litigate the effectiveness of the alleged notice of default on the ground that it does not conform to the requirements of the contract.  Even without the litigation there is an automatic 60-day extension to close as also discussed in the Local Rule Declaration.

In the interim, pursuant to 11 U.S.C. §362, the Seller is stayed from entering into any other contract relating to the subject property or otherwise impeding the Debtor's to purchase the property, or releasing the deposit absent an Order of the Bankruptcy Court.

Please be guided accordingly.

Very truly yours,

/s/ Kevin J. Nash

cc:    Mr. Tim Ziss